## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Jessica S. Allen |
| v. | : | Magistrate. No. 21-8289 (JSA) |
| JESSE LEONARD | : | **CRIMINAL COMPLAINT** |

I, Joseph Sullivan, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Joseph Sullivan, Special Agent
Federal Bureau of Investigation

\* Special Agent Sullivan attested to
this Complaint by telephone
pursuant to F.R.C.P. 4.1.

Sworn to and subscribed before me,

October 8, 2021                 at
Date

Newark, New Jersey
City and State

Honorable Jessica S. Allen
United States Magistrate Judge
Name & Title of Judicial Officer

/s/Jessica S. Allen
Signature of Judicial Officer

## ATTACHMENT A

### Count One
(Bribery)

Between in or about November 2020 and on or about October 6, 2021, in Hudson County, in the District of New Jersey, and elsewhere, defendant

### JESSE LEONARD

did directly and indirectly, corruptly demand, seek, receive, accept and agree to receive and accept things of value – namely money, personally in return for being influenced in the performance of his official acts and being induced to do and omit to do acts in violation of his official duty.

In violation of Title 18, United States Code, Sections 201(b)(2)(A) and (C) and 2.

## ATTACHMENT B

I, Joseph Sullivan, a Special Agent of the Federal Bureau of Investigation ("FBI"), following an investigation and discussions with other law enforcement officers, am aware of the following facts. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. Where statements of others are related herein, including statements that were consensually recorded, these are related in substance and part. Because this Criminal Complaint is being submitted for a limited purpose, I have not set forth every fact that I know concerning this investigation; rather, I have only set forth those facts that I believe are sufficient to show that probable cause exists to believe that the defendant has committed the offenses set forth in Attachment A.

### The Defendants and Other Parties

1.      At all times relevant to this Criminal Complaint:

        a.      Defendant LEONARD ("LEONARD") worked for the United States General Services Administration ("GSA") as a Construction Control Representative ("CCR"). GSA is an agency of the United States Government established to help manage and support the basic functions of federal departments and agencies. A CCR is responsible for developing and managing construction or alteration projects at federal buildings. A CCR's general duties include defining requirements with customers, applying construction and cost estimating methods, administering contracts and inspecting materials and workmanship.

        b.      An individual ("Individual-1") worked for Company-1.

        c.      Confidential Human Source-1 ("CHS-1") and Confidential Human Source-2 ("CHS-2") jointly owned a business ("Company-2") that performed construction work at construction sites, including federal buildings located in Newark, New Jersey.

        d.      Company-2 held an 8A Certification allowing it to receive preferential consideration and sole-source funding contracts to include federal contracts.

        e.      Sole-source funding allows federal construction contracts under certain monetary thresholds to be procured through solicitation of a proposal from only one source. In his capacity as a CCR, LEONARD was permitted to approve sole-source funding contracts at or below a $250,000 threshold.

## Overview of the Bribery Scheme

2.     LEONARD and Individual-1 devised and initiated a bribery scheme whereby LEONARD awarded GSA construction contracts to contractors in exchange for cash payments.

3.     As part of the scheme to solicit and accept bribes, LEONARD sought and accepted United States currency in return for his official action and in violation of his official duties.

## Execution of the Bribery Scheme

4.     In or about November 2020, Company-2 was awarded a sole source funding contract ("Contract-1") by GSA to perform construction work at a federal building located in Newark, New Jersey.  Pursuant to the terms of Contract-1, Company-2 was to receive $242,000 to perform a buildout of the U.S. Probation Office on the first floor of the Martin Luther King, Jr. Federal Courthouse (the "Courthouse") in Newark. ("Project-1").

5.     In or about July 2021, Company-2 was awarded a sole source funding contract ("Contract-2") by GSA to perform construction work at a federal building located in Newark.  Pursuant to the terms of Contract-2, Company-2 was to receive $249,000 to renovate office space on the fifth floor of the Courthouse in Newark.  ("Project-2").

6.     LEONARD was the assigned CCR for both Contract-1 and Contract-2. In or about December 2020, while negotiating a sub-contract for demolition work to be completed under Contract-1, Individual-1 advised CHS-1 that Company-2 needed to kick something back to LEONARD from the sole source contract it had received.  ("Kick Back Call-1").  CHS-1 told Individual-1 that neither CHS-1 nor Company-2 participated in that type of illicit activity.

7.     A few weeks after Kick Back Call-1, LEONARD called CHS-1 directly from a cellular telephone and stated, in sum and substance, that he wanted a 10% kickback.  ("Kick Back Call-2").  CHS-1 again declined the solicitation.

8.     Within a few weeks of Kick Back Call-2, LEONARD approached CHS-1 at a job site at the Martin Luther King, Jr. Federal Courthouse in Newark, New Jersey (the "MLK Courthouse").  On that occasion, LEONARD stated in sum and substance that 10% would be nice, but not necessary.

## Leonard Accepts Cash Bribe Payments From CHS-1

9.      In or about December 2020, representatives of Company-2 alerted law enforcement to the interactions between and among LEONARD, Individual-1 and CHS-1.

10.     On or about May 24, 2021, CHS-1, acting under the direction of the FBI, called LEONARD. During the recorded call, LEONARD was informed by CHS-1 that CHS-1 was willing to revisit the bribery scheme but expressed CHS-1's preference to avoid using Individual-1 as an intermediary. CHS-1 stated to LEONARD that they could work something "straight" between them without the involvement of Individual-1. In sum and substance, LEONARD was informed by CHS-1 that Company-2 needed to make sure that it had a solid stream of work. CHS-1 agreed to look at the current contracts to see if there was a percentage of money that could be "squeeze[d]" out for LEONARD and that if LEONARD had future projects coming up, CHS-1 would take a closer look at what percentage could be set aside and given to LEONARD in the form of a monetary payment. In response, LEONARD stated, "Okay, yeah." LEONARD went on to advise CHS-1 about a "pretty big" upcoming project to renovate a jury room on the first floor and that he might be able to go over the $250,000 threshold. ("Project-3"). LEONARD assured CHS-1 that he would let CHS-1 "know whatever rules I have to play by on this one," and that once he determined the scope of the work, LEONARD would send that information to CHS-1.

11.     On or about July 9, 2021, LEONARD and CHS-1 engaged in a telephone conversation that law enforcement recorded. LEONARD asked CHS-1 if Company-2 would be interested in another project involving the installation of kitchen cabinetry on the first floor of the MLK Courthouse ("Project-4"). LEONARD discussed his ability to access certain GSA databases so that LEONARD could provide CHS-1 with information as to the maximum amount allotted for Project-4 and other construction projects. LEONARD was informed by CHS-1 that such information would assist CHS-1 in allotting the appropriate amount of money to set aside for Project-4 and build prices into future contracts for which LEONARD would ultimately receive a percentage.

12.     On or about July 23, 2021, LEONARD and CHS-1 met in person at the MLK Courthouse. During this recorded meeting, LEONARD and CHS-1 discussed the possibility of finishing up other projects before CHS-1 and Company-2 could get cash back to LEONARD. LEONARD indicated that he was agreeable to whatever was easiest for CHS-1.

13.     On or about August 2, 2021, LEONARD and CHS-1 engaged in a telephone conversation that law enforcement recorded. During this conversation, LEONARD and CHS-1 agreed that cash was the preferred method for LEONARD to receive the contemplated bribes. CHS-1 then asked LEONARD

- 4 -

about the percentage that LEONARD expected to receive.  LEONARD and CHS-1 noted that the standard percentage that they agreed upon would impact the pricing that CHS-1 would include in the contracts over the upcoming months.  LEONARD stated that 7% of the contract amount was acceptable.  CHS-1 agreed to make 7% the standard, meaning that CHS-1 and Company-2 would pay LEONARD 7% for the existing contracts, Contract-1 and Contract-2, and that LEONARD would be paid 7% for prospective sole-source contracts that LEONARD steered to Company-2.  Later in the conversation, LEONARD was asked by CHS-1 to provide CHS-1 information on Project-4 so that CHS-1 could reach the maximum amount allowed.  LEONARD responded that he would send the information regarding the maximum available amount as a contract price on Project-4 to the CHS-1.

14.     On or about August 11, 2021, LEONARD and CHS-1 engaged in a telephone conversation that law enforcement recorded.  During this conversation, LEONARD provided CHS-1 with information as to the maximum amount of money that GSA would spend on an upcoming judicial chambers renovation project.  ("Project-5").  CHS-1 later asked LEONARD if cash was the preferred method to use when making the bribe payments.  LEONARD responded, "Yeah, probably."  CHS-1 indicated that he needed to confer with CHS-2 as to when cash could be withdrawn from the account of Company-2.  LEONARD and CHS-1 then discussed the benefit of making two cash payments in order to keep them under $10,000 and thereby avoid scrutiny from the banking institutions.  When CHS-1 proposed breaking up the payments in this manner, LEONARD responded, "Yeah, that's fine."

15.     On or about September 4, 2021, LEONARD sent a text message to CHS-1 which stated in relevant part:

> Hey [CHS-1].  Hope you're having a good Labor Day Weekend.  Did you have a chance to sort things out and talk to [CHS-2].  Storm hit me pretty good, and need to get some things fixed.

The "storm" reference was likely to Hurricane Ida which impacted New Jersey on or about September 1, 2021.

16.     On or about September 9, 2021, LEONARD and CHS-1 met in person at the MLK Courthouse.  During this meeting, LEONARD advised CHS-1 that "202" (meaning $202,000) was the maximum GSA would pay on Project-5.  LEONARD also asked if CHS-1 would be interested in another project on the first floor of the MLK Courthouse.  ("Project-6").  LEONARD explained that the estimate for Project-6 was approximately $280,000, thus exceeding the threshold of what LEONARD was permitted to issue.  In order to get around this limit, LEONARD suggested that he would break up the contracts so that he would issue two different sole-source contracts to Company-2 for Project-6.  LEONARD advised that he would "put it in" if CHS-1 was interested.  Later in

- 5 -

the meeting, LEONARD was advised by CHS-1 that CHS-2 was going to withdraw the cash and that they should decide on a location for LEONARD to receive the money. LEONARD and CHS-1 agreed to meet in the parking lot of a hotel to be determined. During this meeting, LEONARD suggested that when he and CHS-1 communicated through text messages, they should utilize an untraceable messaging application that would provide a layer of protection and better conceal their communications, likely an attempt to avoid law enforcement scrutiny.

17.    On or about September 13, 2021, during undercover activity directed by the FBI, CHS-1 was provided with $9,500 in official funds to give to LEONARD. Thereafter, shortly after 2:00 p.m., LEONARD met with CHS-1 in the parking lot of a hotel located in Harrison, New Jersey (the "Harrison Hotel").

18.    During this meeting, LEONARD was observed and recorded accepting an envelope containing the $9,500 cash payment from CHS-1. LEONARD was informed by CHS-1 that they could meet again the following week so that LEONARD could receive the balance of the 7% kickback from CHS-1.

19.    On or about September 22, 2021, LEONARD sent CHS-1 an email with an attachment from his GSA email address. The attachment contained an "Estimate Worksheet" that LEONARD had prepared with respect to Project-5 which provided CHS-1 with detailed insider information as to the amount of money that GSA would pay for labor, materials and "Overhead" for Project-5.

20.    On or about October 1, 2021, LEONARD and CHS-1 engaged in a telephone conversation that law enforcement recorded. During this conversation, LEONARD and CHS-1 agreed to meet the following week, at a location to be determined, so that LEONARD could receive the balance of the cash bribe payment from CHS-1.

21.    On or about October 4, 2021, LEONARD and CHS-1 engaged in a telephone conversation that law enforcement recorded. During this conversation, LEONARD and CHS-1 agreed to meet in the parking lot of the Harrison Hotel in order for LEONARD to obtain the second bribe payment. LEONARD was informed by CHS-1 that CHS-1 may have miscounted the money handed over to LEONARD for the first bribe payment and asked LEONARD whether he had counted the money. LEONARD responded that he would message CHS-1. Thereafter, at approximately 3:40 p.m., LEONARD messaged "9500" on the encrypted messaging application that he previously instructed CHS-1 to use. The message "9500" corresponds to the $9,500 cash payment LEONARD received from CHS-1 on September 13, 2021.

22.    On or about October 6, 2021, during undercover activity directed by the FBI, CHS-1 was provided with $8,000 in official funds to give to LEONARD.

- 6 -

Thereafter, shortly after 11:00 a.m., LEONARD met with CHS-1 in the parking lot of the Harrison Hotel.

23.     During this meeting, LEONARD was observed and recorded accepting an envelope containing the $8,000 cash payment from CHS-1. CHS-1 clarified that the two bribe payments totaling $17,500 were related to Contract-2 and that the upcoming bribe payment for $17,000 would be related to Contract-1. During this meeting, LEONARD told CHS-1 that "there's gonna be more" and then spoke about a number of projects that he would continue to steer to CHS-1.  When CHS-1 asked whether these projects would keep Company-2 busy for the next 6 months, LEONARD responded, "Pretty much, yeah."